AO 106 (Rev. 04/10) Application for a Search Warrant         AUTHORIZED AND APPROVED/DATE: K.Blackwell 6.2.2025

# UNITED STATES DISTRICT COURT
для the
Western District of Oklahoma

In the Matter of the Search of )
*(Briefly describe the property to be searched or identify the person by name and address)* )
) Case No. M-25-361-SM
ONE APPLE IPHONE, WITH TWO CAMERA LENSES, IN A BLACK AND PINK CASE WITH A SHARK STICKER )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A," which is attached and incorporated by reference herein.

located in the _____ Western _____ District of _____ Oklahoma _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B," which is attached and incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1153 | Murder in Indian Country |
| 18 U.S.C. § 1111 | |

The application is based on these facts:

See attached Affidavit of OSBI Lieutenant David Gatlin, which is incorporated by reference herein.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*David Gatlin*
Applicant's signature

DAVID GATLIN, OSBI LIEUTENANT
Printed name and title

Sworn to before me and signed in my presence.

Date: June 2, 2025

*[signature]*
Judge's signature

City and state: Oklahoma City, Oklahoma

SUZANNE MITCHELL, U.S. MAGISTRATE JUDGE
Printed name and title

THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE APPLE IPHONE, WITH TWO CAMERA LENSES, IN A BLACK AND PINK CASE WITH A SHARK STICKER | Case No. M-25-361-SM<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**

**AN APPLICATION FOR A SEARCH WARRANT**

I, David Gatlin, a Lieutenant with the Oklahoma State Bureau of Investigation (OSBI), and a Special Deputy U.S. Marshal on the Federal Bureau of Investigation Safe Trails Task Force, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. Your Affiant is David Gatlin, a certified and commissioned police officer in and for the State of Oklahoma, for approximately 17 years, and is currently employed as a Lieutenant for the Oklahoma State Bureau of Investigation (OSBI). Your Affiant was previously employed by the District 3 and District 6 Drug Task Forces. Your Affiant's training and education have included a Bachelor's Degree in Criminal Justice from the University of Oklahoma, OSBI Agent's Academy, the Oklahoma Bureau of Narcotics Investigators Course, and the State of Oklahoma Basic Peace Officer Academy.

2. As a Special Deputy with the FBI Safe Trails Task Force, I am authorized to investigate violations of the laws of the United States that occur in Indian Country, including violations of Title 18, United States Code, Section 1153 and 1111, and to execute warrants issued under the authority of the United States.

3. The information contained in this affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers and witnesses, and review of documents and other records. This Affidavit is made in support of an application for a warrant to search the following digital device: Apple iPhone, with two camera lenses, in a black and pink case with a shark sticker (referred hereafter as SUBJECT DEVICE). The SUBJECT DEVICE is currently located in your Affiant's possession in Purcell, McClain County, Oklahoma which is within the Western District of Oklahoma. The SUBJECT DEVICE is described in detail in Attachment A to this affidavit. I request a warrant to search the SUBJECT DEVICE for the items specified in Attachment B hereto, which constitute instrumentalities, fruits, and evidence of violation of 18 U.S.C. § 1153 and 1111 (Murder).

4. This investigation, described more fully below, has revealed that there is probable cause to believe that evidence of murder is located on the SUBJECT DEVICE.

5. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me regarding this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a search warrant.

## TERMS

6. Based on my training and experience, I use the following technical terms and definitions:

   a. "Computer," as used broadly herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones. *See* 18 U.S.C. § 1030(e)(1).

   b. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the

       addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude, with a high level of precision.

  c.  "Wireless telephone" (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

## PROBABLE CAUSE FACTS

7. On April 18, 2025, JIAN QUAN LIN called Garvin County 911 and requested law enforcement help at 43052 East County Road (ECR) 1600 in Wynnewood, Garvin County, Oklahoma. This location is located within the Chickasaw Nation boundaries and is "Indian Country."

8. Garvin County Sheriff's Deputy CODY LANE responded and found the address to be a marijuana farm. LANE, using Google translate, was told by LIN there was more than one deceased person inside of the residence. LANE and another deputy then entered the residence and found two deceased individuals, later identified as BAO MING MA and ALEJANDRO

BALTAZAR HERNANDEZ. It appeared both sustained gunshot wounds. Garvin County Sheriff JIM MULLETT requested the Oklahoma State Bureau of Investigation's assistance investigating the homicides.

**Investigation of the Crime Scene:**

9. OSBI Special Agents responded to the scene and performed a crime scene investigation. Agents found the deceased body of BAO MING MA in a bed in the northwest bedroom of the residence. Agents did not locate any spent shell casings in the room. However, a fired bullet was found and removed from the wall near MA'S body. MA'S body was taken to the Oklahoma Medical Examiner's (ME) Office and was subsequently found to have sustained two (2) gunshot wounds. MA'S manner of death was presumed to be homicide. The ME'S Office removed one fired bullet from MA'S body and released the fired bullet to the OSBI for analysis.

10. Agents found the deceased body of ALEJANDRO HERNANDEZ in the floor of another bedroom inside of the residence. Agents did not locate any spent shell casings in the room. HERNANDEZ'S body was taken to the Oklahoma ME'S Office and was subsequently found to have sustained three (3) gunshot wounds. HERNANDEZ'S manner of death was presumed to be homicide. The ME'S Office removed two fired bullets and one fragment from HERNANDEZ'S body. These items were released to the OSBI for analysis.

**OSBI Firearms Analysis:**

11. The fired bullets from MA and HERNANDEZ; the fragment taken from HERNANDEZ'S body; and the fired bullet, found in the wall behind MA, was submitted to the OSBI Laboratory for analysis.

12. OSBI Senior Criminalist SAMANTHA MEISINGER examined the evidence and determined the bullets taken from MA'S and HERNANDEZ'S bodies are most consistent with

bullets typically found loaded in 22 Long Rifle cartridges. MEISINGER also determined the fired bullet found in the wall by MA is most consistent with bullets found loaded in 9mm Luger and 357 SIG cartridges. Additionally, she determined this bullet was fired from a firearm with a Glock Marksman Barrel, meaning it was likely fired by a Glock brand pistol.

**Interview of JIAN QUAN LIN:**

13. On April 18, 2025, your Affiant interviewed LIN, who provided the following information:

14. LIN worked two to three days a week, on the marijuana farm, for the man he knew as GUOYING MA (later identified as BAO MING MA). LIN worked with MA and HERNANDEZ the day before (April 17, 2025) and left at approximately 1900 hours. LIN planned to return the next day (April 18, 2025) to continue working for MA.

15. On April 18, 2025, at around 0930 hours, LIN called MA and HERNANDEZ and did not receive an answer. He began driving to the farm, and continued to call MA and HERNANDEZ, but still did not receive an answer. When LIN arrived at the farm, at around 1000 hours, he found the front gate was "dummy" locked, which was unusual. He entered the farm, and then the house, and found MA and HERNANDEZ deceased.

**Area Search & Tower Dump of Crime Scene:**

16. On April 19, 2025, prior to any suspects being identified, your Affiant applied for and received an Area Search and Tower Dump search warrant for the crime scene located at 43052 ECR 1600 in Wynnewood, Garvin County, Oklahoma. GATLIN sent the search warrant to T-Mobile, Verizon Wireless, US Cellular, and AT&T.

**NOTE:** a "tower dump" refers to a search warrant where data is retrieved from a cellular telephone tower to identify devices that connected to those towers during a specific time period. An "area search" refers to a search warrant where historical location data (timing advanced records) is retrieved from a cellular telephone tower which were found at or near a particular location (a crime scene)

during a specific time. Timing advanced records refers to records the service provider, T-Mobile, collects and uses as engineering data. Service providers, such as T-Mobile, measure signal strength, the time it takes for a signal to travel, and the direction from a mobile device to the cell tower site. By measuring this signal, the provider can estimate the distance and direction of the mobile device to the cell tower site and therefore estimate the location of the device.

These historical records estimate the target phone's location (latitude and longitude) with a possible accuracy radius, and/or the distance and direction from the cell site. Utilizing these historical location records can provide investigators with a much smaller footprint of a target phone's location and could place a target phone within close proximity of a crime scene before, during, and after a crime. These records have assisted your Affiant to learn where suspects and victims come from before the crime, where suspects and victims are during the crime, and their movements post-crime. Additionally, these records have also assisted your Affiant in locating the victim of a homicide, that was killed at one place and dumped somewhere else.

17. On April 28, 2025, T-Mobile responded and provided your Affiant with the results of the tower dump and area search of the crime scene. Your Affiant reviewed the records and learned the following:

18. The tower dump indicated ALEJANDRO HERNANDEZ placed a telephone call on April 17, 2025, at 2216 hours, leading your Affiant to believe HERNANDEZ and MA were probably alive at this time.

19. Your Affiant examined the area search records, from April 17, 2025, at 1900 hours, to April 18, 2025, 1000 hours and found approximately 58 devices in the area of the crime scene. Out of these 58 devices, four devices were at or very near the crime scene. Your Affiant was able to identify two of these devices, using HERNANDEZ'S and MA'S cellular telephone records, and learned these devices belonged to victim HERNANDEZ and victim MA. The other two unknown devices were described in the area search records by their International Mobile Subscriber Identity (IMSI) numbers, IMSI: 310260314962049 and IMSI: 310260400431025.

20. The first device was using IMSI: 310260314962049 and was near the crime scene on April 18, 2025, from 0120 hours to 0201 hours. More specifically, this device was at or very near the

scene at 0145 hours, 0146 hours, 0147 hours, and 0152 hours. The second device was using IMSI: 310260400431025 and was near the scene on April 18, 2025, from 0146 hours to 0154 hours. More specifically, this second device was at or very near the crime scene at 0148 hours and 0154 hours. These were the only times these two devices were in the area of the crime scene during the requested timeframe.

**Subscriber Information & User Research:**

21. On April 29, 2025, pursuant to the Area Search & Tower Dump search warrant, your Affiant asked T-Mobile to provide the subscriber's information for the two unknown devices using IMSI: 310260314962049 and IMSI: 310260400431025.

22. On May 1, 2025, T-Mobile responded and provided your Affiant with the subscriber information on the two devices. Your Affiant learned of the following subscriber information related to the two the devices:

23. IMSI: 310260314962049 was subscribed to DELILAH COLLINS, a 71-year-old woman of Wynnewood, Oklahoma. This device was using T-Mobile telephone number (572) 216-9295. Your Affiant, utilizing TLO.com (a law enforcement database of public sourced information) searched telephone number (572) 216-9295 and found WHYITT COLLINS was the primary user of the telephone number. GATLIN later learned, from an Oklahoma Office of Juvenile Affairs report, that DELILAH COLLINS was WHYITT COLLINS' grandmother. Based on the age of DELILAH COLLINS and TLO's indication that WHYITT COLLINS is the main user associated with the telephone number, I believe, in my training and experience, that WHYITT COLLINS was the user of this T-Mobile telephone number.

24. IMSI: 310260400431025 was subscribed to JENNIFER JONES, believed to be a 54-year-old woman of McAlester, Oklahoma. This device was using T-Mobile telephone number (405) 926-0066. Your Affiant, utilizing TLO.com, searched telephone number (405) 926-0066, and

found "ALEX S CARTLIDGE" was the primary user of the telephone number. Your Affiant later learned, from an Oklahoma Office of Juvenile Affairs report, that ALEX'S mother was NATASHA JONES and his half-brother also carried the last name of JONES. Therefore, your Affiant suspects that JENNIFER JONES is a relative of ALEX CARTILIDGE. Based on the age of JENNIFER JONES and TLO's indication that ALEX CARTLIDGE is the main user associated with the telephone number, I believe, in my training and experience, that ALEX CARTLIDGE was the user of this T-Mobile telephone number (405) 926-0066. Law enforcement has since learned, as described below, that the user of this device was 16-year-old juvenile M.R.J (referred hereafter as JUVENILE MRJ), who is a member of the Choctaw Nation, and is ALEX CARTLIDGE's younger half-brother.

**Search of T-Mobile telephone number (572) 216-9295:**

25. On May 12, 2025, your Affiant submitted and obtained a search warrant for the T-Mobile (572) 216-9295 cellular telephone records. Later, T-Mobile responded, GATLIN reviewed the records, and learned the following:

26. T-Mobile telephone number (572) 216-9295 was subscribed to DELILAH COLLINS and WHYITT COLLINS of Wynnewood, Garvin County, Oklahoma.

27. Your Affiant reviewed the timing advance records, and found this device was at or near the residence at 20833 N. County Road (NCR) 3290 in Wynnewood, Garvin County, Oklahoma and the residence at 20923 NCR 3290 in Wynnewood, Garvin County, Oklahoma (referred hereafter as the JONES PROPERTY). The JONES PROPERTY is owned by JOHN JONES and SUSIE JONES (now deceased) are next door to each other. On April 18, at approximately 1221 hours, the device began traveling east on ECR 1600, away from the JONES PROPERTY, toward the crime scene. On April 18, 2025, at approximately 0125 hours, the device was near the crime scene. On April 18, 2025, at approximately 0146 hours, the device was at or very near the crime

scene. On April 18, 2025, at approximately 0155 hours, the device began moving away from the crime scene, and subsequently returned to the JONES PROPERTY.

**Search of T-Mobile telephone number (405) 926-0066:**

28. On May 14, 2025, your Affiant obtained a federal search warrant for the T-Mobile (405) 926-0066 cellular telephone records. On May 16, 2025, T-Mobile responded, GATLIN reviewed the records, and learned the following:

29. T-Mobile telephone number (405) 926-0066 was subscribed to JENNIFER JONES of McAlester, Oklahoma.

30. GATLIN reviewed the timing advance records, and found this device was at or near the JONES PROPERTY on April 17, 2025, at around 2310 hours. The next timing advanced records produced was approximately 2 ½ hours later, on April 18, 2025, at 0146 hours. On April 18, 2025, at approximately 0146 hours, the device was at or very near the crime scene. On April 18, 2025, in between 0154 hours and 0218 hours, the device began moving away from the crime scene and traveled back toward the JONES PROPERTY. On April 18, 2025, at 0239 hours, T-Mobile received timing advance information for the device. This was the last timing advance record for the device until 1101 hours later the same morning.

**Search of the JONES PROPERTY:**

31. On May 20, 2025, your Affiant applied for and received a federal search warrant for the JONES PROPERTY. Your Affiant was seeking among other items, "Cellular telephone reasonably believed to belong to ALEXANDER SHERMAN CARTLIDGE or those reasonably believed to be using telephone number (405) 926-0066."

32. On May 23, 2025, OSBI Special Agents and the Chickasaw Lighthorse Police Department (LHPD) served the search warrant at the JONES PROPERTY. LHPD contacted JUVENILE MRJ

and escorted him to OSBI Special Agent TONY NAVARRO. LHPD released JUVENILE MRJ and the SUBJECT DEVICE to NAVARRO.

33. OSBI Special Agent JUSTIN BROWN and ZACHARY THOMPSON interviewed JUVENILE MRJ, who provided the following information:

34. JUVENILE MRJ'S confirmed the SUBJECT DEVICE was his cellular telephone and his telephone number was the above-described T-Mobile (405) 926-0066. JUVENILE MRJ stated that he and WHYITT COLLINS planned to conduct a robbery at the marijuana grow (crime scene). JUVENILE MRJ was armed with a Glock 9mm pistol and COLLINS was armed with a .22 caliber revolver. The two walked from the JONES PROPERTY to the crime scene and entered the property through the fence. Once inside, JUVENILE MRJ and COLLINS entered the residence. JUVENILE MRJ went to one bedroom and COLLINS to another. Each bedroom was occupied. JUVENILE MRJ heard COLLINS fire approximately four gunshots. The male occupant in the room JUVENILE MRJ was in, then stood and moved towards him. JUVENILE MRJ then fired one gunshot from his 9mm pistol, causing the male to grab his chest. JUVENILE MRJ did not know if he shot the person or not. COLLINS then entered the room with JUVENILE MRJ and shot the person one to two more times. JUVENILE MRJ knew that COLLINS also shot the person in the other bedroom.

35. Your Affiant seized JUVENILE MRJ'S cellular telephone, which is the SUBJECT DEVICE, and is currently in your Affiant's possession in Purcell, McClain County, Oklahoma which is within the Western District of Oklahoma

## SPECIFICS OF SEARCH AND SEIZURE OF CELL PHONES

36. Searches and seizures of evidence from smartphones commonly require agents to download or copy information from the smartphones and its components, such as an SD Card attached to the phone, by a qualified expert in a laboratory or other controlled environment. This

is almost always true for the following two reasons:

    a.    Smartphone devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all of the stored data that is available in order to determine whether it is included in the warrant that authorizes the search. This sorting process can take days or weeks, depending on the volume of data stored, and is generally difficult to accomplish on-site.

    b.    Searching smartphones for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of smartphone hardware and software available requires even experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a smartphone system is an exacting scientific procedure that is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since smartphone evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

## SEARCH METHODOLOGY TO BE EMPLOYED REGARDING ELECTRONIC DATA

37. The search procedure for electronic data contained in smartphone hardware, smartphone software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

    a.    examination of all of the data contained in such smartphone hardware,

smartphone software, or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

 b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offense specified above);

 c. surveying various file directories and the individual files they contain;

 d. opening files in order to determine their contents;

 e. scanning storage areas;

 f. performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and

 g. performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

## CONCLUSION

38. In my training and experience, and in consultation with other Law Enforcement Officers that perform these types of investigations, conversations are commonly had via text message or other messaging applications between the co-conspirators or other close family or friends regarding the crime being investigated.

39. Based on the above information, there is probable cause to believe that the foregoing laws have been violated, and that evidence of these offenses are located on the

SUBJECT DEVICE.

40. Based upon the foregoing, I respectfully request that this Court issue a search warrant for the SUBJECT DEVICE, described in Attachment A, authorizing the seizure of the items described in Attachment B to this affidavit.

*David Gatlin*

David Gatlin
Special Agent
Oklahoma State Bureau of Investigation

SUBSCRIBED AND SWORN to before me this 2d day of ~~May~~ June, 2025.

SUZANNE MITCHELL
United States Magistrate Judge

# ATTACHMENT A

## DESCRIPTION OF SUBJECT DEVICE

SUBJECT DEVICE – Apple iPhone, with two camera lenses, in a black and pink case with a shark sticker



## ATTACHMENT B

### LIST OF ITEMS TO BE SEIZED

1. All records on the SUBJECT DEVICE described in Attachment A that relate to violations of 18 U.S.C. § 1111 (Murder), including:

   a. Evidence of user attribution showing who used or owned the SUBJECT DEVICE;

   b. records relating to communication between JUVENILE MRJ and WHYITT COLLINS, and any other communication relating to the criminal offense above, to include those that have been deleted, including: incoming and outgoing voice messages; text messages; emails; multimedia messages; applications that serve to allow parties to communicate; all call logs; secondary phone number accounts, including those derived from Skype, Line 2, Google Voice, and other applications that can assign roaming phone numbers; and other Internet-based communication media;

   c. records relating to documentation or memorialization of the criminal offenses above, including voice memos, notes, photographs, videos, and other audio and video media, and all ExIF information and metadata attached thereto including device information, geotagging information, and information of the relevant dates to the media;

   d. records relating to the planning and execution of the criminal offense above, including Internet activity, including firewall logs, caches, browser history, and cookies, "bookmarked" or "favorite" web pages, search terms that the user

       entered any Internet search engine, records of user-typed web addresses, account information, settings, and saved usage information;

   e. application data relating to the criminal offenses above;

   f. evidence of the times SUBJECT device was used;

   g. Passwords, encryption keys, and other access devices that may be necessary to access the SUBJECT DEVICE;

   h. Documentation and manuals that may be necessary to access the TARGET DEVICE or to conduct a forensic examination of the SUBJECT DEVICE;

   i. Evidence of programs (and associated data) that are designed to eliminate data from the SUBJECT DEVICE;

   j. Evidence of the attachment to the SUBJECT DEVICE of other storage devices or similar containers for electronic evidence;

   k. all records and information related to the geolocation and travel records of the SUBJECT DEVICE at a specific point in time.

2. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as an SD Card) and any photographic form.

3. A search of the physical device to collect any device identifiers, serial numbers, or other identifiers.